## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

GLEN J.,

      Plaintiff,

v.                                             CIVIL ACTION NO. 2:21-cv-00584

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

      Defendant.

### PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Glen J. ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. (ECF No. 1.) By standing order entered on January 4, 2016, and filed in this case on November 2, 2021, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3.) Presently pending before this Court are Claimant's Brief in Support of Plaintiff's Motion for Judgment on the Pleadings (ECF No. 6), and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 7).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding United States District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 6), **GRANT** the Commissioner's request to affirm her decision (ECF No. 7), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 41 years old at the time of his alleged disability onset date, as amended, and 46 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (Tr. 12, Tr. 85.)[1] Claimant has a High School Diploma from Kanawha County Schools, where he attended special education classes. (Tr. 327.) He has worked in the past as a tire-service worker, a dump-truck driver, and a delivery-truck driver. (Tr. 58.)

Claimant protectively filed his application for a period of disability and Disability Insurance Benefits on May 8, 2019, alleging that he became disabled on December 18, 2015,[2] due to back and neck pain, degenerative disc disease in the lumbar and cervical spine, carpal tunnel syndrome, right-shoulder abnormality, panic disorder, generalized anxiety disorder, major depressive disorder, somatic pain disorder, borderline intellectual functioning, high blood pressure, cholesterol, and nerve damage. (Tr. 41-42, 219, 326.) His claim was initially denied on October 18, 2019, and again upon reconsideration on December 20, 2019. (Tr. 124-142.) Thereafter, on February 6, 2020, Claimant filed a written request for hearing. (Tr. 143-144.) An administrative hearing was held before an ALJ on April 27, 2021; the hearing was held via videoconference due to the circumstances presented by the COVID-19 pandemic. (Tr. 37-41.) On May 24, 2021, the ALJ rendered an unfavorable decision. (Tr. 12-36.) Claimant then sought review of the ALJ's decision by the Appeals Council on June 9, 2021. (Tr. 213-215.) The Appeals Council

---

[1] All references to "(Tr.)" refer to the Transcript of Proceedings filed in this action on December 14, 2021. (ECF No. 5.)

[2] Subsequently on April 4, 2021, Claimant amended his disability onset date to December 4, 2018. (Tr. 320.)

denied Claimant's request for review on September 8, 2021, and the ALJ's decision became the final decision of the Commissioner on that date. (Tr. 1–7.)

Claimant timely brought the present action on October 29, 2021, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1.) The Commissioner filed a timely Answer (ECF No. 4) and a transcript of the administrative proceedings (ECF No. 5) on December 14, 2021. Claimant subsequently filed a timely Brief in Support of Judgement on the Pleadings (ECF No. 6), and in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 7). As such, this matter is fully briefed and ripe for resolution.

### B. Relevant Evidence

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it in relevant part here for the convenience of the United States District Judge.

#### i. Medical Evidence

On December 19, 2015, outside of the relevant time period, Claimant was injured at work when he fell down a landing from a staircase while carrying a refrigerator being delivered. (Tr. 243, 661.) He sought medical treatment at Charleston Area Medical Center ("CAMC"), complaining of low-back pain radiating to the left leg, posterior aspect, to the foot, with numbness and tingling in both feet. (Tr. 243, 661.) While a thoracic spine x-ray was within normal limits, an MRI showed multi-level degenerative disc disease, greatest at L4-L5, with some central canal and foraminal narrowing at that level. (Tr. 1148-1151.) Physical examination showed tenderness and limited range of motion of the lumbar spine, but Claimant's gait was normal and motor sensory reflex testing was normal at that

time. (Tr. 1150.) Claimant thereafter complained of lumbar pain, bilateral leg pain, and foot pain intermittently flaring up from time to time. (Tr. 594, 661).

Approximately three years later on December 10, 2018, during the relevant time period, Claimant sought emergency care for worsening low back pain. (Tr. 679.) He exhibited a guarded gait and positive straight leg raising test at 30 degrees. (Tr. 681.) He was discharged with a diagnosis of acute exacerbation of chronic low back pain. (Tr. 679.)

On December 19, 2018, Claimant followed up with his primary-care provider Grace Falbo, DO. (Tr. 597.) He presented with a normal gait and was "ambulating normally." (Tr. 598.) Claimant complained of acute low back pain and numbness and tingling in his legs. (Tr. 597.) He indicated that physical therapy in the past did not alleviate his pain. (Tr. 597.) He also complained of dyspnea on exertion. (Tr. 597.) He exhibited limited lumbar range of motion due to pain, mild tissue edema, and tenderness in the left lumbar paraspinal region. (Tr. 597-98.) Dr. Falbo diagnosed chronic back pain and dyspnea, and ordered a lumbar MRI (Tr. 598). Claimant reported that he was willing to see a pain doctor if necessary, but said that "he absolutely will not get injections in his back for pain relief." (Tr. 597.) The subsequent lumbar MRI dated January 7, 2019 showed mild degenerative changes in the lower lumbar spine (Tr. 598-99).

Claimant returned for a follow-up appointment with Dr. Falbo on April 18, 2019. (Tr. 594-595.) Claimant complained of neck back pain radiating down his left arm, associated with numbness and weakness (Tr. 594). He also complained of back pain radiating down the groin and his legs (Tr. 594). Dr. Falbo diagnosed chronic back pain and recommended physical therapy; she also referred Claimant to a pain specialist, but Claimant stated he did not want injections "right now." (Tr. 595). Claimant reported that

4

he had lost twelve pounds in the past four months by trying to be more active and walking (Tr. 595).

On September 10, 2019, Claimant presented to orthopedist Paul Legg, MD, to follow up after reporting to the CAMC emergency department. (Tr. 623.) Claimant had seen Dr. Legg in 2017 for a rotator cuff tear. Claimant reported a new injury to his right shoulder, stating that he was plugging in a cord a week before and felt something "pop" in his right shoulder. (Tr. 623.) Dr. Legg reviewed x-rays and a CT scan of the right shoulder from CAMC and noted there was no fracture or dislocation, and the joint spaces were well preserved. (Tr. 624.) Dr. Legg diagnosed Claimant with right-bicipital tendonitis, and Claimant underwent a tendon injection (Tr. 624-25). Dr. Legg instructed Claimant to follow up on an as-needed basis. (Tr. 624.)

During a neurological evaluation on October 16, 2019, Claimant complained of syncopal episodes, or fainting spells. (Tr. 644-45.) A tilt table test dated November 18, 2019 showed a mild degree of orthostatic hypotension, with no evidence of vasodepressive syncope. (Tr. 653.)

On November 1, 2019, Claimant was seen at the Pain Clinic for an initial pain management consultation for leg-pain complaints. He was diagnosed with lumbar radiculopathy and further testing was ordered; however, a subsequent electromyography ("EMG") report dated November 18, 2019, was unremarkable. (Tr. 664, 698-99.)

An EMG study of Claimant's bilateral lower extremities taken in February 2020 had normal findings (Tr. 698-99). Claimant also reported at that time that he had no further syncope events (Tr. 697).

In a follow-up on February 12, 2020, Mr. Jenkins described experiencing transient vertigo (Tr. 697). Robert Lewis, MD diagnosed orthostatic hypotension, vertigo, syncope,

and cervical myelopathy and ordered a brain MRI, which was unrevealing (Tr. 702-03, 706).

A cervical MRI dated March 6, 2020 showed degenerative changes at C2-3, C3-4, and C4- 5. (Tr. 708.)

Claimant reported in April 2020 that he had no further syncope or vertigo, but had occasional lightheadedness. (Tr. 777).

Claimant commenced physical therapy in May 2020 for his cervical complaints. (Tr. 710.) Although the treatment plan called for two to three sessions per week for five weeks, ultimately Claimant only attended five sessions Between May 2020 and June 2020 for his cervical radiculopathy and cervicalgia. (Tr. 710-22.)

An EMG study dated May 19, 2020 revealed moderate left carpal tunnel syndrome (Tr. 787-88). Claimant was prescribed a brace. A follow-up EMG taken in October 2020 showed no evidence of a left cervical radiculopathy or myopathy (Tr. 1250-51).

On May 19, 2020, Claimant was seen at the emergency room for chest pain following the EMG study. (Tr. 800.) He was discharged with a diagnosis of chest pain and panic attack. (Tr. 801.)

On September 23, 2020, Claimant described experiencing vertigo episodes, neck pain, and hand numbness. (Tr. 844.) Claimant was referred to a pain specialist. (Tr. 851.)

Claimant presented to the emergency room in October 2020, reporting experiencing several months of left-sided pain and tingling radiating into the arm and leg. (Tr. 1243.) Claimant's physical examination was largely unremarkable, with no point tenderness. (Tr. 1243.) An MRI of Claimant's lumbar spine taken at that time showed mild degenerative changes with mild central canal stenosis at L3-4. (Tr. 863-64.)

In addition to the above physical treatment, Claimant also received mental-health treatment for major depressive disorder and panic disorder with agoraphobia during the relevant time period. (Tr. 611.) On January 31, 2019, Claimant presented with anhedonia, depressed mood, lack of motivation, low energy, and panic (Tr. 611). Russell Voltin, MD diagnosed depression, major, and panic disorder with agoraphobia; Dr. Voltin prescribed Lexapro and Vistaril. (Tr. 613-14.) Claimant reported that his symptoms have been "present for years and are more manageable with treatment." (Tr. 611.) Mental status examinations throughout the relevant period reflect intact memory and normal attention and concentration. (Tr. 613, 617, 620, 1349, 1352, 1355, 1358.)

## ii. Hearing Evidence

At the April 27, 2021 hearing before the ALJ, medical expert Dr. David Owens testified that he did not believe Claimant would meet or equal a specific listing, although work-related dysfunctionality should be shown including limitation "to no more than light duty" along with limitations on postural activities, hand controls, and environmental limitations. (Tr. 45-46.)

Psychology medical expert Dr. Gary Bennett next testified that he did not "see anything that would meet or equal a listing," and classified the majority of Claimant's limitations as moderate. (Tr. 49.) As to Claimant's panic disorder, Dr. Bennett testified that the medical records lacked a detailed explanation or substantiation of the frequency or severity of Claimant's panic attacks during the time period at issue. (Tr. 48-51.) With regard to specific work-related dysfunctionality, Dr. Bennett opined that Claimant "would be capable of simple, repetitive tasks in a low-stress work environment" with "no fast-paced production rate or strict production quotas." (Tr. 50.) Dr. Bennett testified that he would also limit Claimant to only occasional superficial contact with the general public

and occasional contact with coworkers and supervisors. (Tr. 50.)

Claimant also testified at the hearing, where he was represented by counsel. Claimant testified that he has panic attacks "at least once per day." (Tr. 54.) He described the symptoms of his panic attacks, testified that they are distracting, and stated that it takes him approximately thirty minutes to calm down after a panic attack. (Tr. 54-55.) Claimant likewise described his vertigo symptoms as well as pain he experiences in his back and legs that causes him to lay down two to three times per day. (Tr. 55-56.) Finally, Claimant testified that his wife has to remind him to take his medicine and that she helped him dress himself every morning. (Tr. 57.)

Finally, vocational expert ("VE") Patricia Posey testified at the hearing. (Tr. 57-62.) In response to hypothetical limitations posed by the ALJ, Ms. Posey testified that the hypothetical individual would not have capacity for Claimant's past work, but that there would be potential work in the national economy such as a hand packager, night cleaner, and hand bander. (Tr. 60.) In response to further hypothetical limitations posed by the ALJ, the VE testified that an individual who cannot attend to tasks eighty-five percent of the time would be unable to sustain gainful employment. (Tr. 60.) Likewise, in response to questions from Claimant's counsel, the VE testified that if a hypothetical individual consistently missed two days of work per month, he or she would have difficulty sustaining work in the long term; if he or she missed more than two days per month, it would preclude him or her from all work. (Tr. 61-62.)

### C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an

impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's [RFC]" before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of his or her past relevant work.

20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If the claimant does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether he or she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find him or her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant cannot perform other work, the ALJ will find him or her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant had not engaged in substantial gainful activity during the period from his alleged onset date of December 4, 2018 through his date last insured of December 31, 2020. The ALJ found that Claimant's degenerative disc disease of the cervical and lumbar spine, major joint disease of the right shoulder, neuropathy, left carpal tunnel syndrome, anxiety disorder, panic disorder, major depressive disorder, borderline intellectual functioning, and somatic pain disorder constituted "severe" impairments. (Tr. 18.) However, the ALJ found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 19.)

Assessing Claimant's RFC, the ALJ found that Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (Tr. 23.) The ALJ determined that during the relevant time period the Claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b), with limitations. (Tr. 21.) Specifically, the ALJ determined that Claimant was capable of lifting, carrying, pushing, and pulling 20 pounds occasionally and 10 pounds frequently. (Tr. 21.) He was able to sit for six hours and stand and/or walk six hours in an eight-hour day. (Tr. 21.) He had to alternate from sitting to standing or walking for two to three minutes after every two hours, and had to alternate from standing or walking to sitting for two to three minutes after every hour but always with capacity to remain on task during all position changes, some of which would be covered by time of task and typical work breaks. (Tr. 21-22.) He could frequently operate foot controls, occasionally operate hand controls, frequently reach overhead on the left and occasionally on the right, and frequently reach in all directions bilaterally. (Tr. 22.) He could frequently handle, finger, and feel with the left upper extremity. (Tr. 22.) He could occasionally climb ramps and stairs, as well as stoop, kneel, and crouch. (Tr. 22.) He could never climb ladders, ropes, or scaffolds, balance, navigate uneven or slippery terrain, or crawl. (Tr. 22.) He could never work at unprotected heights or in proximity to moving mechanical parts of dangerous machinery. (Tr. 22.) He could never operate a motor vehicle. (Tr. 22.) He could occasionally work in weather, humidity, wetness, and pulmonary irritants. (Tr. 22.) He could never work in extreme cold, extreme heat, and vibration. (Tr. 22.) He could work in no louder than moderate noise and have no exposure to flashing, glaring, or

strobing lights, though typical office fluorescent lights were endurable without restriction. (Tr. 22.) Claimant could not have complex tasks, work with a high production rate, or fast-paced work. (Tr. 22.) He could occasionally interact with supervisors, coworkers, and the public, but could have no teamwork or customer service work. (Tr. 22.) He was able to tolerate no more than a few changes in a routine work setting, defined as should not be expected to adapt to the performance of new and unfamiliar duties as primary work tasks without orientation (i.e., he is not a self-starter). (Tr. 22.) Finally, the ALJ determined that in addition to normal breaks, Claimant would have been off task only fifteen percent of an eight-hour day. (Tr. 22.)

The ALJ found that Claimant had past relevant work as a tire service worker (heavy exertion), dump truck driver (medium exertion), and delivery truck driver (medium exertion as generally performed, but heavy to very heavy exertion as actually performed). (Tr. 29.) Agreeing with the testimony of the Vocational Expert ("VE"), the ALJ found that the Claimant was unable to perform past relevant work as actually or generally performed. (Tr. 29.) The ALJ further characterized Claimant as a younger individual with a high school education, and noted that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the Claimant has transferable job skills." (Tr. 29.) Because the ALJ determined that the Claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations, the ALJ enlisted a vocational expert to aid in finding that Claimant is capable of working at the light exertion level as a hand packager, night cleaner, or hand bander. (Tr. 30.) As a result, the ALJ concluded that the Claimant was

not under a disability from the alleged onset date of December 4, 2018, through the date last insured of December 31, 2020. (Tr. 30.)

## II.   LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.   ANALYSIS

### A. Claimant's Subjective Complaints vs. Objective Evidence

First, Claimant asserts that the ALJ misapplied the test for evaluating a claimant's subjective statements about his symptoms as set forth in Social Security Ruling 16-3p, *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, 2017 WL 5180304 (Oct.

25, 2017) ("SSR 16-3p"). (ECF No. 6 at 7-9.) Specifically, Claimant asserts that the ALJ overemphasized the importance of consistency of the Claimant's subjective complaints of pain with the objective record evidence, on the grounds that SSR 16-3p "does not mandate that the claimant's allegations be completely consistent with the record[.]" (ECF No. 6 at 9 (citing *Fyfe v. Saul*, 0:19-cv-3599, 2020 U.S. Dist. LEXIS 203342, at *7-8, 2020 WL 6336013, at *4 (D.S.C. Oct. 29, 2020)).)

Claimant's reliance on *Fyfe* is not particularly apt due to the special circumstances of that claimant's sickle-cell anemia—a disorder that the *Fyfe* court noted often does not produce objective evidence. *Fyfe*, 2020 WL 6336013, at *4. Thus, the *Fyfe* court's ruling was expressly made "in light of the nature of sickle cell anemia," and the matter was remanded "for further consideration of Plaintiff's sickle cell anemia in accordance with the applicable standards." *Id.* Regardless, the *Fyfe* decision turned on the ALJ's failure "to identify any objective evidence that is *inconsistent* or *contrary* to Plaintiff's allegations of disabling limitations[.]" *Id.* (emphasis in original). As the *Fyfe* court explained, "a claimant's allegations about his pain may not be discredited *solely* because they are not substantiated by objective evidence of pain[.]" *Id. See also Gilmore*, 2022 WL 2869047, at *5 (differentiating the claimant's argument from cases concerning conditions like fibromyalgia that do not produce objective medical evidence).

Claimant does not argue that his conditions are the type—like fibromyalgia and sickle-cell anemia—that do not produce objective medical evidence. Thus, the relevant inquiry is whether the ALJ improperly discredited Claimant's subjective complaints of pain solely due to the lack of supporting objective evidence, or whether the ALJ appropriately identified objective evidence that was inconsistent with, or contrary to, Plaintiff's allegations of disabling limitations. *Fyfe*, 2020 WL 6336013, at *4.

On review, the ALJ comprehensively discussed the medical evidence and Plaintiff's subjective complaints. (Tr. 22-26.) Therein, the ALJ highlighted evidence that he found to be inconsistent with Plaintiff's allegations of disabling limitations. For instance, the ALJ noted that Claimant's complaint of chronic back pain at the emergency room on December 10, 2018 occurred three years after Claimant's back injury and was accompanied by Claimant's statement that "he was currently in the process of trying to obtain his disability." (Tr. 23.) The ALJ also highlighted the December 19, 2018 note of Dr. Falbo—Claimant's primary-care physician—that Claimant "demonstrated normal ambulation" despite complaining of low back pain and an MRI of the lumbar spine showed only "mild degenerative changes in the lower lumbar spine." (Tr. 23.) Likewise, the Claimant "indicated he had muscle spasms in his back, but was only tak[ing] Skelaxin as needed." (Tr. 23.) Additionally, the ALJ found that Claimant's "activities of daily living further indicates the claimant functioned at a higher level than alleged physically[.]" (Tr. 26.) Specifically, Claimant reported "trying to be more active and walking," feeding his dogs, mowing his lawn, driving, and fishing. (Tr. 26.) The ALJ also cited to the testimony of Dr. Owens that Claimant could perform work consistent with the ALJ's RFC. (Tr. 26-27.) In sum, the ALJ thoughtfully and exhaustively detailed the objective evidence that he found to be inconsistent or contrary to Claimant's allegations of disabling limitations. Whether the Court agrees with the inferences the ALJ drew is immaterial, as "[w]here conflicting evidence allows reasonable minds to differ . . . the responsibility for that decision falls on the [ALJ]" and it is not the Court's role "to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653. Thus, the undersigned ALJ's decision is supported by substantial evidence, it must be affirmed.

The same is true for Claimant's next challenge. Claimant asserts that the ALJ disregarded his complaints of severe pain "simply because it [was] not supported by objective medical evidence." (ECF No. 6 at 9.) Not so. As set forth above, the ALJ highlighted evidence that he found to be *inconsistent with* Plaintiff's allegations of disabling limitations. Furthermore, Claimant's complaints of severe pain were not disregarded by the ALJ. To the contrary, the ALJ "added more limits" to Dr. Owens's opinions regarding Claimant's postural, reaching, and environmental restrictions, limiting Claimant to a very restrictive range of simple, light work. (Tr. 26-28.)

Third, the Claimant challenges the ALJ's decision because the ALJ remarked that Claimant did not get injections in his back, but "failed to properly question [Claimant] regarding this alleged non-compliance" with this prescribed course of treatment. (ECF No. 6 at 9-10 (citing Tr. 23).) Relying on the *Dunston* case, Claimant correctly notes that "[b]efore a claimant is denied disability benefits because of a failure to follow a prescribed course of treatment, the adjudicator must inquire into the circumstances surrounding the failure." *Dunston v. Berryhill*, 5:17-cv-380, 2018 WL 4576783, at *9 (E.D.N.C. June 5, 2018), *recommendation adopted*, 2018 WL 4204639 (Sept. 4, 2018). However, Claimant omits the conclusion in *Dunston* that the ALJ "referenced [the claimant's] noncompliance but did not solely rely on this reason to find she was not fully credible." *Id.* at *10. Like the ALJ in *Dunston*, the ALJ in this case "also pointed to the generally normal examination findings, conservative and infrequent treatment, the efficacy of medications at controlling [the claimant's] symptoms, and [the claimant's] wide variety of activities of daily living." *Id.* Thus, just as the *Dunston* court concluded, here the ALJ's remark regarding Claimant's refusal to get injections is not a legitimate basis for remand.

Fourth and finally, Claimant argues that this matter should be remanded because "the ALJ cited [Claimant's] daily activities to undermine the severity of his symptoms . . . but did not consider the extent to which [Claimant] was able to perform them." (ECF No. 6 at 10.) Unlike the *Woods* case relied upon by Claimant, (*see* ECF No. 6 at 10), here Claimant has not pointed to evidence in the record that the ALJ failed to consider. *See Woods*, 888 F.3d at 695-96 (noting that the ALJ did not consider Woods's statements regarding her limitations); *see also Brown v. Commissioner*, 873 F.3d 251, 263 (4th Cir. 2017) ("The ALJ did not acknowledge the extent of those activities *as described by Brown*") (emphasis added). To the contrary, the ALJ considered Claimant's statements about what he can and cannot do, as well as the limited ability he has to perform those daily activities:

> The claimant testified during the last two years he has had panic attacks at least once a day and nothing makes them better. He indicated he has trouble breathing during a panic attack. The claimant noted he has vertigo and feels dizzy causing him to lean against something to keep his balance. He stated he has pain in his back and legs. The claimant testified he lays down two or three times during the day. He indicated he sits in a recliner and uses a heating pad or Icy Hot. The claimant noted he has problems with his memory. He stated his wife helps him dress in the morning.

(Tr. 22-23.) In considering this evidence, the ALJ both pointed to conflicting evidence, and "included time off task as reflected in [Claimant's RFC] in considering [Claimant's] physical, as well as psychological complaints." (Tr. 25.) *See also Goins v. Berryhill*, 4:17-cv-37, 2019 WL 1418288, at *4 (W.D. Va. Mar. 28, 2019) (citing *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018)). In sum, where, as here, the ALJ considered all the evidence in the record and the ALJ's decision is supported by substantial evidence, it must be affirmed.

### B. Constitutional Challenges

Finally, Claimant challenges the decision of the Social Security Administration ("SSA") in this case because "SSA's structure is unconstitutional as it violates separation of powers." (ECF No. 6 at 11.) Specifically, Plaintiff argues that "[t]he United States Supreme Court has held that it is unconstitutional for an executive agency to be led by a single head who serves for a longer term than the President and can only be removed from his position for cause." *Id.* (citing *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2197 (2020)). According to Plaintiff, the "constitutionally invalid structure" of the Consumer Financial Protection Bureau at issue in the *Seila Law LLC* case "is identical to that of the SSA," in that "[t]he Commissioner of SSA is the singular head of the [SSA], serves for six years, and cannot be removed by the President except for cause ('neglect of duty or malfeasance in office')." (ECF No. 6 at 11 (citing 42 U.S.C. § 405(b)(1)).) Plaintiff further maintains that "[t]he ALJ's delegation of authority in this case came from [then-Commissioner] Andrew Saul and is therefore constitutionally defective." *Id.* (citing Hearings, Appeals, and Litigation Law Manual (HALLEX) § I-2-0-2(A)), as well as that "the ALJ decided this case under regulations promulgated by [then-Commissioner] Saul when [he] had no constitutional authority to issue those rules." *Id.* In Plaintiff's view, the ALJ's decision must be vacated because he did not have the authority to decide the case given the delegation of authority came from then-Commissioner Saul, who Plaintiff argues had no constitutional authority to head the SSA.

In response, the Commissioner argues that Claimant must demonstrate harmful error through a nexus between the Commissioner's tenure protection and the ALJ's denial of his disability benefits claim. (ECF No. 7 at 16-17.) The harmful error standard the Commissioner's brief highlighted is essentially correct in the analysis at hand. In contrast

to Appointments Clause cases, where harm is presumed when courts have found unconstitutional the very authority under which a government official has acted, the instant circumstances require Claimant to demonstrate that the unconstitutional provision regarding the SSA Commissioner's tenure impacted then-Commissioner Saul's ability to carry out the duties of his office; harm is not presumed. *See Gilmore v. Kijakazi*, 1:21-cv-420, 2022 WL 2869047 (M.D.N.C. July 21, 2022). In fact, the U.S. Supreme Court in *Seila Law LLC* expressly rejected the plaintiffs' argument that because the agency head's tenure provision was unconstitutional, all agency action should be rendered unconstitutional automatically. *Seila Law*, 140 S. Ct. at 2209. To the contrary, the Supreme Court concluded that the removal limitation was severable because the agency "remain[ed] fully operative without the offending tenure restriction." *Id.* Nor has Claimant pointed to any authority supporting the argument that an invalid tenure provision rendered the SSA's actions void from the outset. To the contrary, "[c]ourts across the country have uniformly concluded that the allegedly unconstitutional nature of 42 U.S.C. § 902(a)(3) does not require remand." *Fish v. Kijakazi*, 5:21-cv-182, 2022 WL 1504887, at *6 (N.D. W. Va. Apr. 26, 2022) (collecting cases), *recommendation adopted*, 2022 WL 1498115 (N.D. W. Va. May 11, 2022). Similarly, Claimant here has not pointed the Court to any "new regulations, agency policies or directives Commissioner Saul installed that may have affected [his] claims." *Gilmore*, 2022 WL 2869047, at *13. Simply put, Claimant's second and final assignment of error does not entitle him to relief.

### IV.  *CONCLUSION*

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 6), **GRANT** the Commissioner's request to affirm her decision (ECF

No. 7), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Thomas E. Johnston, Chief United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Johnston.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: December 2, 2022

Dwane L. Tinsley
United States Magistrate Judge